

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED**
**06/18/2013**

| | | |
|---|---|---|
| In re: | § | **Case No. 08-36084** |
| | § | |
| **MPF Holding US LLC, *et al.*,** | § | **Chapter 11** |
| | § | |
| Debtors. | § | **Jointly Administered** |
| **Jeff Compton, Litigation Trustee of the MPF Litigation Trust,** | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | **Adv. Proceeding No. 10-03477** |
| | § | |
| **Mustang Engineering Ltd.,** | § | |
| | § | |
| Defendant. | § | |
| | § | |

## MEMORANDUM OPINION ON DEFENDANT MUSTANG ENGINEERING LTD.'S RENEWED MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)
[Adv. Doc. No. 28]

### I.   INTRODUCTION

Jeff Compton, Litigation Trustee (the Litigation Trustee) of the MPF Litigation Trust, brought the instant adversary proceeding to recover alleged preferential payments made to the Defendant, Mustang Engineering Ltd. (Mustang).   Pending before the Court is Mustang's renewed motion to dismiss, which alleges that (1) the debtor assumed and assigned its contract with Mustang pursuant to section 365 of the Bankruptcy Code,[1] and thus is barred as a matter of law from now pursuing a preference action against Mustang; and (2) even if the debtor did not assume and assign its contract with Mustang, the instant preference action was, nevertheless, released pursuant to the debtors' confirmed plan of reorganization.   Thus, the ultimate issue

---

[1] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section refers to a section in 11 U.S.C., which is the United States Bankruptcy Code.

which this Court now decides is whether the Litigation Trustee has standing to pursue the instant preference avoidance action against Mustang.

The Court finds that the Litigation Trustee lacks standing to bring this preference avoidance action, and that dismissal is warranted under Federal Rule of Civil Procedure 12(b)(1). The Court issues this Opinion to articulate its reasons for making this decision, to add to the law surrounding reservation of claims in a Chapter 11 plan of reorganization, and to emphasize two points: (1) parties to an executory contract in bankruptcy may not circumvent the requirements of section 365 of the Code; and (2) once an executory contract is assumed pursuant to section 365, the contract assumption defense bars future preference actions that seek to recover payments made pursuant to that contract. This Court now makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 9014 and Federal Rule of Civil Procedure 52, as made applicable by Federal Rule of Bankruptcy Procedure 7052.[2]

## II.  FINDINGS OF FACT

1. On May 8, 2007, Mustang, as subcontractor, entered into an agreement with Dragados Offshore, S.A., as contractor, (the Original Contract) whereby Mustang agreed to provide engineering and design work related to the construction of a floating vessel capable of drilling, producing, storing, and offloading oil, gas, and other minerals. [Adv. Doc. No. 1, ¶ 11].

2. On June 13, 2008, Mustang, Dragados Offshore, S.A., and MPF Corp. Ltd. (MPF) entered into a novation agreement related to the Original Contract whereby MPF agreed

---

[2] To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

to replace Dragados Offshore, S.A. as contractor (the Contract). *See* [Main Case Doc. No. 392-25, p. 2, ¶ B] (referencing the Contract).

3. On September 24, 2008, MPF Holding US LLC and MPF filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. [Case No. 08-36084, Doc. No. 1; Case No. 08-36086, Doc. No. 1]. On September 25, 2008, MPF-01 Ltd. (collectively with MPF Holding US LLC and MPF, the Debtors) filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. [Case No. 08-36094, Doc. No. 1].

4. The Contract is listed on MPF's Schedule G under executory contracts. [Case No. 08-36086, Doc. No. 22, p. 20].

5. On October 2, 2008, this Court entered an Order Directing Joint Administration of these three cases. [Main Case Doc. No. 18]. This order allowed for a single disclosure statement and plan of reorganization to be filed for all three cases. [*Id.*].

6. On March 26, 2010, Mustang, as Vendor, MPF, as the Original Buyer,[3] and COSCO (Dalian) Shipyard Co., Ltd., as the New Buyer (COSCO), entered into a novation agreement related to the Contract (the Novation Agreement). [Main Case Doc. No. 392-25]. Pursuant to the Novation Agreement, MPF "agreed, subject to the approval by the US Bankruptcy Court . . . , to transfer the [Contract] and all obligations, rights, title(s) and interests under the [Contract] to [COSCO]," and COSCO "agreed, subject to the approval by the US Bankruptcy Court . . . , to have the [Contract] transferred to it and assume all obligations, rights, title(s) and interests of [MPF] under the [Contract]." [Main Case Doc. No. 392-25, p. 2]; [Mustang's Ex. D-1].

---

[3] MPF is the contractor under the Contract; but, under the Novation Agreement, MPF is defined as the Original Buyer. Presumably, this is because MPF took over the Original Contract from Dragados Offshore, S.A.

The Novation Agreement contained the following language pertaining to settlements and/or releases:

> 4.1   As full and final settlement of all past, present and future claims between the Parties, the New Buyer shall pay to the Vendor an amount equal to GBP 873,279.83, which amount shall be the "Cure Amount" defined in Clause 1.3.[4]

[Main Case Doc. No. 392-25, p. 6].

> 3.4    With effect from the Effective Date, and without any further act on the part of any party hereto or any other person, Vendor (a) releases Original Buyer, its affiliates, and their respective bankruptcy estates, equity owners, directors, officers, employees, consultants, agents, attorneys, and other representatives (collectively, the "Original Buyer Released Parties") from any and all obligations and liabilities that such parties may have under the Vendor Contract, including, without limitation, the obligation to pay the Cure Amount, and (b) waives any and all claims, actions, causes of action, suits, liabilities, losses, damages, costs and expenses of any kind or character that Vendor may have or in the future could have against the original Buyer Released Parties under or in connection with the Vendor Contract.

> 3.5    Save as recorded in Clause 5, the New Buyer, with effect from the Payment Date (a) releases Vendor, its affiliates, and their respective bankruptcy estates, equity owners, directors, officers, employees, consultants, agents, attorneys and other representatives (collectively, the "Vendor Released Parties") from any and all obligations and liabilities that such parties may have under the Vendor Contract, and waives any and all claims, actions, causes of action, suits, liabilities, losses, damages, costs and expenses of any kind or character that New Buyer may have or in the future could have against the Vendor Released Parties under or in connection with the Vendor Contract.

---

[4] Clause 1.3 defines "Cure Amount" as follows:

> [T]he amount of money that as of the Effective Date the Parties will deem owed to the Vendor under the Vendor Contract, which amount shall be paid to the Vendor by the New Buyer by way of the Escrow Agent in exchange for receipt of the Work in accordance with Clauses 4 and 5 below.  For the avoidance of doubt, the Cure Amount includes any and all amounts necessary to cure all defaults of the original Buyer under the Vendor Contract up to the Effective Date, including, without limitation, amounts relating to past due invoices and incidental costs claimed by the Vendor.

[Main Case Doc. No. 392-25, p. 3].

[*Id.*].

7.  On June 3, 2010, MPF and MPF-01 Ltd. entered into an Assignment and Purchase

    Agreement (the APA) with COSCO wherein COSCO agreed to purchase and assume the

    their "rights, title and interest in and to certain assets and contracts." [Main Case Doc.

    No. 392-1, p. 4]. In relevant part, the APA provided:

> Novation Agreements. Prior to the Closing Date, MPF and Purchaser [i.e.,
> COSCO] shall enter into a novation agreement with each Vendor . . .
> pursuant to which, effective as of the Closing Date, the Parties shall
> implement the purchase and sale described in Section 2.1, Purchaser shall
> assume all obligations and liabilities of MPF or MPF-01, as applicable,
> arising under, or relating to, all Vendor Contracts (including the obligation
> to pay the Cure Amounts . . . ), MPF and its related parties shall be
> released by all Vendors from any and all obligations and liabilities arising
> under, or relating to, the Vendor Contracts, and all Vendors waive any
> claims or causes of action against MPF and its related parties; provided,
> however, that, if MPF, Purchaser and a Vendor cannot agree to the terms
> of a Novation Agreement, Sellers may, at the sole option and direction of
> Purchaser, seek approval from the Bankruptcy Court to assume and assign
> the applicable Vendor Contract pursuant to Section 365 of the Bankruptcy
> Code, subject to the payment of the Cure Amount set forth in the
> applicable Assignment Order.

[*Id.* at p. 8]. The APA defines "Cure Amount" as follows:

> [W]ith respect to a Vendor Contract, the amount of money necessary to
> cure all defaults of Sellers under such Vendor Contract, (a) as set forth on
> Schedule A and agreed to by and among the Vendor under such Vendor
> Contract, Sellers and Purchaser in the applicable Novation Agreement, or
> (b) as set forth in an Assignment Order.

[*Id.* at p. 5].

8.  On June 8, 2010, the Debtors filed their Amended Joint Plan of Reorganization (the

    Plan). [Main Case Doc. No. 392]. The Plan, in Section 4.01, states as follows:

> The Debtors will seek authority, in Connection with Confirmation of the
> Plan, to sell the Acquired Assets to the Purchaser, pursuant to the terms of
> the [APA] . . . and the relevant Novation Agreements . . . and/or the
> Confirmation Order with respect to executory contracts that may be
> assumed and assigned in the absence of a Novation Agreement.

[*Id.* at p. 16].

Section 4.03 of the Plan, entitled "The Litigation Trust and Litigation Trustee," established a Litigation Trust and provided that all "Causes of Action" not expressly released were transferred to a Litigation Trust to be pursued by a Litigation Trustee (i.e., Jeff Compton) on the estate's behalf. [*Id.* at pp. 18–20]. That section, in pertinent part, reads as follows:

> On the Effective Date, a Litigation Trust is hereby created for the purpose of pursuing the Causes of Action for the benefit of holders of Allowed Class 4 Claims. The Litigation Trust will not engage in the conduct of a trade or business. The Plan shall serve as the trust instrument and no other trust instrument shall be prepared or entered into. The Debtors and Liquidating MPF are and shall be treated as the Grantors of the Litigation Trust, and the Debtors and Liquidating MPF are owners of the res being transferred to the Litigation Trust.
>
> Excluding any Cause of Action released in connection with or under the Plan or by prior order of the Court, all Causes of Action, including, but not limited to, (i) any Avoidance Action[5] that may exist against any party identified on Exhibits 3(b)[6] or 3(c) of the Debtors' statements of financial affairs, which schedules are incorporated herein by reference . . . are reserved in Liquidating MPF and shall be transferred to the Litigation Trust as of the Effective Date, to be pursued by the Litigation Trustee . . . .
>
> . . .
>
> The Litigation Trustee shall have the right to prosecute and enforce any rights to payment of claims or other rights and Causes of Action that the Debtors, Liquidating MPF, or the Estates may hold against any Person (except to the extent waived, settled, or released under this Plan or by prior order of the Bankruptcy Court).

---

[5] The Plan defines "Avoidance Actions" as "any and all actual or potential claims or Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including §§ 542, 543, 544, 545, 547, 548, 549, 550, 551, 553, and 724(a)." [Main Case Doc. No. 392, p. 4].

[6] Mustang is listed on Exhibit 3(b) to the Debtors' Statement of Financial Affairs. See [Mustang's Ex. D-5]; [Case No. 08-36086, Doc. No. 23, p. 21]. However, only some, but not all, of the payments made to Mustang are listed. The Litigation Trustee seeks to recover at least $4,359,322.80 of allegedly preferential payments; yet, $2,627,002.80 worth of these payments are not listed.

[*Id.* at pp. 18–19].  Further, the Plan defines "Causes of Action" as including preference

avoidance actions.

Section 6.01 of the Plan, entitled "Assumption/Rejection," provides:

The Debtors will assume and assign to the Purchaser all executory contracts identified on Schedule 1 to the Plan[7] pursuant to each applicable Novation Agreement.

On the Effective Date, and to the extent permitted by applicable law, all of the Debtors' executory contracts and unexpired leases will be rejected unless such executory contract or unexpired lease:  (a) is being assumed pursuant to the Plan or the Assignment and Purchase Agreement and the applicable Novation Agreement . . . .

[*Id.* at p. 22].  "Novation Agreement" is defined under the Plan as follows:

[A]ny one of the agreements between the Debtors, the Purchaser, a Vendor, and/or DvB, as applicable, pursuant to which the Debtors will assign their rights under the applicable Vendor Contract to the Purchaser, which Novation Agreement shall include, among other things, the agreed upon Cure Cost with respect to such applicable Vendor Contract.

[*Id.* at p. 10, ¶ 72].

"Vendor Contract" means "each contract and agreement described on

Schedule A to the Assignment and Purchase Agreement (including all

amendments, modifications, supplements, waivers, change orders, or other

variations thereto) which will be assumed and assigned to the Purchaser in

connection with the sale of the Acquired Assets."  [*Id.* at p. 12, ¶ 96].

The Plan defines "Cure Amounts" as "[t]he Cure Amount with respect to

any executory contract to be assigned pursuant to the terms of the Assignment and

Purchase Agreement and a Novation Agreement shall be the amount set forth in

the applicable Novation Agreement and identified on Schedule 1 to this Plan."

---

[7] Mustang's contract is identified on Schedule 1 to the Plan.  *See* [Main Case Doc. No. 392-43, p. 2].

[*Id.* at p. 22]. "Cure Costs" are defined as "all costs required of a Debtor to cure any and all defaults including pecuniary losses, pursuant to Bankruptcy Code § 365, of such Debtor arising under any executory contract to which such Debtor is a party, or any unexpired lease to which such Debtor is a party." [*Id.* at p. 7, ¶ 40].

As it pertains to releases, section 12.05 of the Plan provides:

(a)  Releases by Debtors and Estates
Except as otherwise expressly provided in the Plan, the Assignment and Purchase Agreement, the Novation Agreements . . . or the Confirmation Order, on the Effective Date, to the fullest extent permissible under applicable law, each of the Debtors and Liquidating MPF on its own behalf and as representative of its respective Estate, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims, Causes of Action (excluding any Avoidance Actions). . .

[*Id.* at p. 32].

Article XI of the Plan, entitled "Compromises and Settlements," provides that:

. . . each of the Novation Agreements effect a compromise or settlement among the parties thereto as particularly specified therein.

[*Id.* at p. 29].

Finally, Section 12.10 of the Plan, entitled "Binding Effect," provides that "[t]he Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims against and Interests in the Debtors, their respective successors and assigns, including, but not limited to, the Debtors, and all other parties-in-interest in these Chapter 11 Cases."

[*Id.* at p. 36].

9. On June 9, 2010, this Court held a disclosure statement and confirmation hearing. At the

hearing, Richard Petrie, financial advisor to the Debtors, testified as follows:

> I just wanted to expand slightly on the novation process. Mostly those
> have been two steps. There's been a novation agreement between
> COSCO, MPF and the vendor, and usually a separate agreement between
> COSCO and the vendor, which has dealt mostly with the modifications
> and changes, but just as to illustrate to the Court that this had been quite
> detailed and complex and each one of these has had to be negotiated.
>
> I think just another clarification in terms of the work being assumed by
> COSCO, they have taken over the responsibilities that MPF had for the
> completion of the vendor novation contracts that we had, but in addition to
> that, they will have substantial integration work to do; and, therefore,
> there's significant risk and professionals needed to complete the project.

[June 9, 2010 Tr. at 58:7–58:21]. Further, Debtors' counsel, Courtney S. Lauer,

stated:

> I would like to announce that initially there were two vendors that we had
> not reached agreement with, with respect to novation agreements that were
> outstanding and we contemplated possibly seeking to assume and assign
> their contracts over their objections, if necessary, but in the interim, we
> have reached agreements with those two vendors, such that all of the
> vendors that are identified in the Assignment and Purchase Agreement,
> have reached agreements with the Debtors in COSCO and all assignments
> will be done on that Schedule 1, pursuant to consensual novation
> agreements with those vendors.

[*Id.* at 24:8–18].

10. On June 14, 2010, this Court entered an "Order Confirming Debtors' Amended Joint Plan

of Reorganization (as modified)" (the Confirmation Order). [Main Case Doc. No. 401].

The Confirmation Order contains the following relevant language:

> Assumption of Executory Contracts and Unexpired Leases (11 U.S.C. §
> 1123(b)(2)). Except as otherwise provided in the Plan, or in any contract,
> instrument, release, indenture, or other agreement or document entered
> into in connection with the Plan, as of the Effective Date, all of the
> Debtors' executory contracts and unexpired leases will be rejected unless
> such executory contract or unexpired lease: (a) is being assumed pursuant
> to the Plan or the Assignment and Purchase Agreement and the applicable

9

Novation Agreement . . . .  This Confirmation Order shall constitute an order of the Court under Bankruptcy Code § 365 approving the contract Novation Agreements, each as of the Effective Date.

[*Id.* at p. 24, ¶ 20].

> Assumption of Executory Contracts and Leases.  The Court finds and concludes that the assumption or rejection of executory contracts pursuant to the Plan is a reasonable exercise of the Debtors' business judgment and is in the best interests of the Debtors and their respective Estates and further finds that the terms and provisions of the Novation Agreements attached to the Plan as Exhibit B,[8] with the Vendors listed on Schedule 1 of the Plan[9] are reasonable and appropriate to effect the assumption and assignment of such Vendor Contracts.

[*Id.* at pp. 17–18, ¶ LL].

11. The effective date of the Plan was August 9, 2010.

12. On September 23, 2010, the Litigation Trustee initiated the above-referenced adversary proceeding by filing a "Complaint to Avoid and Recover Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550" (the Complaint).  [Adv. Doc. No. 1].  The Complaint alleges the receipt of avoidable preferences by Mustang in the amount of "not less than" $4,359,322.80. [*Id.* at ¶ 12].

13. On December 15, 2010, Mustang filed a "Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6)" (the Original Motion to Dismiss).  [Adv. Doc. No. 6].

14. On January 14, 2011, this Court issued an Order dismissing the above-referenced adversary proceeding after finding that the Plan did not "specifically and unequivocally" preserve the cause of action brought by the Litigation Trustee to recover alleged preferential payments from Mustang, as required under existing Fifth Circuit law.  [Adv.

---

[8] The Novation Agreement among the Debtors, Mustang, and Cosco is attached to the Plan as Exhibit B.

[9] Mustang was listed as a vendor on Schedule 1 of the Plan.  *See* [Main Case Doc. No. 392-43, p. 2].

Doc. No. 12]. On March 8, 2011, this Court certified this issue for direct appeal to the Fifth Circuit Court of Appeals. [Adv. Doc. No. 27].

15. On November 14, 2012, the Fifth Circuit Court of Appeals issued its decision. *See Compton v. Anderson (In re MPF Holdings US LLC)*, 701 F.3d 449 (5th Cir. 2012). The Fifth Circuit found that the Plan was sufficiently specific and unequivocal in that it "excluded 'any Cause of Action released in connection with or under the Plan or by prior order of the Court' from the scope of reserved claims." *Id.* at 452. However, the Fifth Circuit remanded back to this Court the issue of whether individual defendants (such as Mustang) were, in fact, "released in connection with or under the Plan or by prior order of the Court." *Id.* at 457.

16. On January 8, 2013, Mustang filed a "Renewed Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6)" (the Motion to Dismiss). [Adv. Doc. No. 28].

17. On January 29, 2013, the Litigation Trustee filed his Response opposing the Motion to Dismiss. [Adv. Doc. No. 29].

18. On March 28, 2013, this Court held a hearing on the Motion to Dismiss. Counsel for the Litigation Trustee and counsel for Mustang appeared and made arguments. The Court then took the matter under advisement.

## III.   CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This is a core proceeding in the first instance pursuant to 28 U.S.C. § 157(b)(2)(L) due to the need to interpret certain Plan provisions. The Fifth Circuit has

consistently held that a bankruptcy court has post-confirmation jurisdiction over matters "that bear on the interpretation or execution of the debtor's plan." *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001); *In re U.S. Brass Corp.*, 301 F.3d 296, 304 (5th Cir. 2002); *Newby v. Enron Corp. (In re Enron Corp. Sec.)*, 535 F.3d 325, 335 (5th Cir. 2008).

This is also a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E) and (F) because it is a proceeding to determine, avoid, or recover a preference and the remedy sought is turnover of property of the estate. Finally, it is core under the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance."). Venue is proper pursuant to 28 U.S.C. § 1409(a).

## B. Constitutional Authority to Enter a Final Order

The Supreme Court's decision in *Stern v. Marshall* recognized certain limitations on bankruptcy courts' constitutional authority to enter final orders. *Stern v. Marshall*, 131 S. Ct. 2594 (2011). Therefore, this Court has a duty to question its constitutional authority to enter a final order for any matter brought before it. The Court concludes that the facts in the pending suit are distinguishable from those in *Stern*, and that this Court has the authority to enter a final order in this adversary proceeding. In *Stern*, the debtor filed a counterclaim based solely on state law, and the resolution of this counterclaim did not resolve the validity, or invalidity, of the

12

claim held by the defendant. *Id.* First, the dispute at bar is distinguishable from *Stern* because it requires this Court to interpret language in the Plan. Additionally, the instant adversary proceeding is distinguishable from the suit in *Stern* because here, the Litigation Trustee seeks relief pursuant to 11 U.S.C. §§ 547 and 550. Thus, the cause of action and the requested relief are based on express provisions of the Code rather than on state law, which formed the basis for the counterclaim in *Stern*. For these reasons, this Court is constitutionally authorized to enter a final order in this adversary proceeding.

## C. The Complaint Should be Dismissed Pursuant to Federal Rule of Civil Procedure 12(b)(1) Because this Court Lacks Subject Matter Jurisdiction to Hear and Determine the Litigation Trustee's Claims

Under Federal Rule of Civil Procedure 12(b)(1),[10] this Court must dismiss the complaint if it finds that it lacks subject matter jurisdiction to hear the dispute.[11] "'A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case.'" *Champions Truck & Equip. Inc. v. Patterson*, 2008 U.S. Dist. LEXIS 55343, at *5 (S.D. Tex. July 21, 2008) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)). Here, Mustang alleges that this Court is without subject matter jurisdiction to consider the instant cause of action because the Litigation Trustee lacks standing to assert the claim. [Adv. Doc. No. 28]; *see also S. La. Ethanol, LLC v. Messer*, 2012 U.S. Dist. LEXIS 88046, at *5 (E.D. La. June 25, 2012) ("Standing is one element of the constitutional power to adjudicate a case . . . .").

---

[10] Federal Rule of Bankruptcy Procedure 7012 provides that Federal Rule of Civil Procedure 12 applies in adversary proceedings. FED. R. BANKR. P. 7012(b).

[11] The Court notes that it has jurisdiction to determine whether it has subject matter jurisdiction over the dispute at bar. *See Henry v. United States*, 277 Fed. App'x 429, 434 n. 11 (5th Cir. 2008) ("A court always has jurisdiction to consider its jurisdiction . . . .") (citing *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376 (1940) (holding that a federal court has authority to determine whether it has subject matter jurisdiction over a dispute)); *Trevino v. Michelin N. Am., Inc.*, 2006 U.S. Dist. LEXIS 17754, at *26 (S.D. Tex. Mar. 23, 2006) ("The court has the authority to pass upon its own jurisdiction . . . .") (quoting *Chicot County Drainage Dist.*, 308 U.S. at 376).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) may be characterized as either facial or factual. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). A facial attack is based solely upon the complaint itself, whereas "[a] 'factual attack' [] challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.* Though not expressly stated, it is apparent that the Motion raises a factual attack since it is not based solely upon the Complaint and refers to documents outside the pleadings, such as the Plan and Novation Agreement. *See* [Adv. Doc. No. 28].

In considering a factual attack brought pursuant to Federal Rule of Civil Procedure 12(b)(1), the Fifth Circuit quoted the following language with approval:

> Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1921) (citing *Mortensen v. First Fed. Sav. & Loan Assn.*, 549 F.2d 884, 891 (3d Cir. 1977)). "The [] court consequently has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* at 413. Finally, the burden of proof is on the party asserting that subject matter jurisdiction exists—here, the Litigation Trustee. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

1. <u>The Litigation Trustee Lacks Standing to Pursue the Instant Preference Action Because the Contract was Assumed and Assigned Pursuant to Section 365 of the Code</u>

The contract assumption defense provides that when a debtor assumes an executory contract in bankruptcy, the debtor may not later pursue an avoidance claim for preferential payments made pursuant to that contract. *See Kimmelman v. Port Auth. of N.Y. & N.J. (In re Kiwi Air Lines, Inc.)*, 344 F.3d 311, 322–23 (3d Cir. 2003); *In re Superior Toy & Mfg. Co.*, 78 F.3d 1169, 1174 (7th Cir. 1996); *Alvarado v. Walsh (In re LCO Enters.)*, 12 F.3d 938, 943 (9th Cir. 1993); *Seidle v. Gatx Leasing Corp.*, 778 F.2d 659, 665 (11th Cir. 1985). In the instant dispute, Mustang alleges that "the agreement underlying the alleged preferential transfers [i.e., the Contract] was assumed by the Debtors and assigned to a third party [i.e., COSCO]." [Doc. No. 28, p. 4]. Therefore, Mustang argues that the contract assumption defense bars the Litigation Trustee from pursuing the instant preference action. *Id.*

The Litigation Trustee alleges that the contract assumption defense is inapplicable in the dispute at bar because the Contract was not assumed and assigned pursuant to section 365 of the Code. [Doc. No. 29, pp. 13–19]. Instead, the Litigation Trustee argues that the Novation Agreement is what it purports to be—a novation—and that section 363 of the Code is the more applicable provision. [Tape Recording, 03/28/2013 Hearing at 10:40:20–10:41:04 a.m.]. However, the Litigation Trustee notes that even if this Court finds that the Contract was assumed and assigned pursuant to section 365, this Court should not apply the contract assumption defense in the circumstances at bar, where assumption and assignment of the Contract was negotiated. [*Id.* at 10:50:15–10:50:35 a.m.].

This Court will first address the question of whether the Contract was assumed and assigned pursuant to section 365 of the Code, and then will turn to the question of whether to apply the contract assumption defense.

    a. *The language of the Plan and Confirmation Order unambiguously indicates that the Contract was assumed and assigned*

15

Section 365 of the Code provides that, subject to the court's approval, a trustee[12] may assume any executory contract[13] of the debtor. 11 U.S.C. § 365(a). Further, section 365(b)(1), in relevant part, states that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee—
> (A) cures, or provides adequate assurance that the trustee will properly cure, such default . . . .

11 U.S.C. § 365(b)(1). First, the Court notes that the Contract was an executory contract. The Contract is listed as such on MPF's Schedule G [Finding of Fact No. 4], and the Litigation Trustee has not disputed this characterization. Additionally, section 6.01 of the Plan refers to a list of executory contracts, and this list includes the Contract. [Finding of Fact No. 8].

Further, the plain language of the Plan and Confirmation Order indicates that the Contract was assumed and assigned. First, the Plan itself states that executory contracts were assumed and assigned pursuant to the "applicable novation agreements." [*Id.*]. The section of the Plan entitled "Assumption/Rejection" provides:

> The Debtors will assume and assign to the Purchaser all executory contracts identified on Schedule 1 to the Plan pursuant to each applicable Novation Agreement.
>
> On the Effective Date, and to the extent permitted by applicable law, all of the Debtors' executory contracts and unexpired leases will be rejected unless such executory contract or unexpired lease: (a) is being assumed pursuant to the Plan

---

[12] A debtor in possession may also assume an executory contract, as 11 U.S.C. § 1107 provides that a debtor in possession has most of the rights, powers, and duties of the trustee.

[13] "Executory contract" is not defined by the Code. The most commonly cited definition of "executory contract" is an agreement in which "the obligation of both the bankrupt and the other party are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." V. Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 MINN. L. REV. 439, 460 (1974); *see also Matter of Murexco Petroleum, Inc.*, 15 F.3d 60, 62–63 (5th Cir. 1994) (citing this definition with approval); *In re Tex. Wyo. Drilling, Inc.*, 486 B.R. 746, 754 (Bankr. N.D. Tex. 2013) (noting that the Fifth Circuit has adopted the Countryman definition).

or the Assignment and Purchase Agreement and the applicable Novation Agreement . . . .

[*Id.*]. "Novation Agreement" is defined under the Plan as follows:

[A]ny one of the agreements between the Debtors, the Purchaser, a Vendor, and/or DvB, as applicable, pursuant to which the Debtors will assign their rights under the applicable Vendor Contract to the Purchaser, which Novation Agreement shall include, among other things, the agreed upon Cure Cost with respect to such applicable Vendor Contract.

[*Id.*].

The Contract was an "executory contract[] identified on Schedule 1 to the Plan[,]" and as such, the Contract was assumed and assigned pursuant to the Novation Agreement.  Together, these provisions of the Plan make clear that the novation agreements were simply the means by which the Debtors were to assume and "assign their rights under the applicable Vendor Contract to the Purchaser."

In addition, the Confirmation Order expressly authorizes the assumption of executory contracts under section 365 pursuant to the novation agreements.  The Confirmation Order provides that "all of the Debtors' executory contracts and unexpired leases will be *rejected unless* such executory contract or unexpired lease:  (a) is being *assumed* pursuant to the Plan or the Assignment and Purchase Agreement and the applicable Novation Agreement . . . ." [Finding of Fact No. 10] (emphasis added).  The Confirmation Order also states, "[t]his Confirmation Order shall constitute an order of the Court under Bankruptcy Code § 365 approving the contract Novation Agreements . . . ." [*Id.*].  Further, in the Confirmation Order, this Court found:

that the assumption or rejection of executory contracts pursuant to the Plan is a reasonable exercise of the Debtors' business judgment and is in the best interests of the Debtors and their respective Estates and further finds that the terms and

17

provisions of the Novation Agreements attached to the Plan as Exhibit B,[14] with the Vendors listed on Schedule 1 of the Plan[15] are reasonable and appropriate to effect the assumption and assignment of such Vendor Contracts.

[*Id.*].  There would have been no need to include this language in the Confirmation Order had the parties not contemplated that the Vendor Contracts, including the Contract, were being assumed and assigned pursuant to section 365.

In response, the Litigation Trustee focuses on isolated language in the APA and the Plan, which allegedly demonstrates that novation and section 365 assumption and assignment were two separate and alternative mechanisms for transferring the Debtor's interest in the Contract to COSCO.  [Adv. Doc. No. 29, p. 14].  Specifically, the Litigation Trustee emphasizes the following language in the APA:

> [I]f MPF, Purchaser and a Vendor cannot agree to the terms of a Novation Agreement, Sellers may, at the sole option and direction of Purchaser, seek approval from the Bankruptcy Court to assume and assign the applicable Vendor Contract pursuant to Section 365 of the Bankruptcy Code, subject to the payment of the Cure Amount set forth in the Applicable Assignment Order.

[Finding of Fact No. 7].  Notably, this language does **not** state that the novation agreements did not accomplish assumption and assignment pursuant to section 365, or that entering into a novation agreement is a stark alternative to assumption and assignment under section 365.

As discussed above, the Plan and Confirmation Order make clear that the novation agreements were the means of accomplishing assumption and assignment pursuant to section 365.  Thus, when considered in context, this language in the APA merely indicates that novation agreements were the first or preferred means of accomplishing consensual assumption and assignment pursuant to section 365.  However, in the event that the parties were unable to do so,

---

[14] The Novation Agreement among MPF, Mustang, and COSCO is attached to the Plan as Exhibit B.

[15] Mustang was listed as a vendor on Schedule 1 of the Plan.  *See* [Main Case Doc. No. 392-43, p. 2].

this provision of the APA provides that at the option of the purchaser (i.e., COSCO), the parties would then pursue traditional, non-consensual assumption and assignment pursuant to section 365.

The Litigation Trustee also cites the following language from the Plan in support of his position that assumption and assignment is separate and distinct from the novation agreements:

> The Debtors will seek authority, in Connection with Confirmation of the Plan, to sell the Acquired Assets to the Purchaser, pursuant to the terms of the [APA] . . . and the relevant Novation Agreements . . . and/or the Confirmation Order with respect to executory contracts that may be assumed and assigned in the absence of a Novation Agreement.

[Finding of Fact No. 8]. Here, again, there is no language indicating that assumption and assignment cannot occur pursuant to a novation agreement. Stated differently, the fact that assumption and assignment may occur "in the absence of a [n]ovation [a]greement" does not mean that assumption and assignment cannot also occur consensually pursuant to a novation agreement. [*Id.*].

The same can be said for statements made by various parties at the confirmation hearing. For example, the Litigation Trustee alleges that the following statements support his contention that novation and section 365 assumption and assignment were two distinct alternatives:

(1) Statement by Debtors' counsel, Courtney S. Lauer:

> I would like to announce that initially there were two vendors that we had not reached agreement with, with respect to novation agreements that were outstanding and we contemplated possibly seeking to assume and assign their contracts over their objections, if necessary, but in the interim, we have reached agreements with those two vendors, such that all of the vendors that are identified in the Assignment and Purchase Agreement, have reached agreements with the Debtors in COSCO and all assignments will be done on that Schedule 1, pursuant to consensual novation agreements with those vendors.

[June 9, 2010 Tr. at 24:8–18]; [Finding of Fact No. 9].

(2) Statement by Debtors' chief executive officer, Richard Petrie:

19

> I just wanted to expand slightly on the novation process. Mostly those have been two steps. There's been a novation agreement between COSCO, MPF and the vendor, and usually a separate agreement between COSCO and the vendor, which has dealt mostly with the modifications and changes, but just as to illustrate to the Court that this has been quite detailed and complex and each one of these has had to be negotiated.
>
> I think just another clarification in terms of the work being assumed by COSCO, they have taken over the responsibilities that MPF had for the completion of the vendor novation contracts that we had, but in addition to that, they will have substantial integration work to do; and, therefore, there's significant risk and professionals needed to complete the project.

[*Id.* at 58:7–58:21]; [Finding of Fact No. 9]. First, the Court is not required to consider these statements because it has found that the language of the Plan and Confirmation Order is unambiguous. Yet, it is worth noting that again, these statements simply indicate that novation was a means of accomplishing assumption and assignment consensually. They do **not** indicate that consensual assumption and assignment under the novation agreements was governed by some provision other than section 365.

Further, the fact that the Plan and APA referred to the payments to be made to the vendors as "Cure Amounts" or "Cure Costs," regardless of whether the payments were made pursuant to novation agreements or pursuant to assumption orders, is further evidence that assumption and assignment pursuant to section 365 was contemplated in both instances. *See* [Finding of Fact Nos. 7 & 8]. Section 365 explicitly provides that where there has been a default under an executory contract, the trustee may not assume that contract without *curing* the default. 11 U.S.C. § 365(b)(1). Thus, the fact that the parties referred to the amounts to be paid to the vendors as cure amounts or cure costs indicates that the payments were being made to cure defaults in order to allow for assumption pursuant to section 365.

In sum, the Court finds that the language in the Plan and Confirmation Order unambiguously indicates that the Contract was assumed and assigned pursuant to section 365,

and that the Novation Agreement was merely the means by which this assumption and assignment was carried out.  Of particular importance is the language in the Plan indicating that "[t]he Debtors will assume and assign to the Purchaser [i.e., COSCO] all executory contracts identified on Schedule 1 to the Plan[,]" which included the Contract [Finding of Fact No. 8]; and the language in the Confirmation Order stating that it constitutes "an order of the Court under Bankruptcy Code § 365 approving the contract Novation Agreements . . . ." [Finding of Fact No. 10].  Because the language is unambiguous, further discovery is unwarranted; rather, the Court will rely solely on the four corners of the relevant documents.

> b. *Courts have held that section 365 is the sole provision for dealing with executory contracts in bankruptcy*

The Litigation Trustee has argued that section 363 of the Code, which provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[,]" more appropriately applies to the circumstances at bar. [Tape Recording, 03/28/2013 Hearing at 10:40:20–10:41:04 a.m.]; 11 U.S.C. § 363(b)(1).  Yet, he has pointed to no case law addressing circumstances in which an executory contract in bankruptcy was dealt with other than pursuant to section 365.  To the contrary, courts have held that section 365 is the exclusive means of effectuating assumption and assignment of executory contracts in bankruptcy.  Two cases cited by Mustang help shed light on this issue.

In *Robinson Truck Line, Inc.*, the debtor sought to assume an executory contract and proposed to treat the arrearages under the contract as a priority claim to be paid at a rate of $4,000 per month. *In re Robinson Truck Line, Inc.*, 47 B.R. 631, 637 (Bankr. N.D. Miss. 1985). Section 365, which provides that the debtor may not assume an executory contract unless it cures any default or provides adequate assurance that it will promptly cure any default, would allow for the debtor's proposed treatment of the delinquencies so long as the debtor could provide

adequate assurance of prompt cure. *Id.* (citing 11 U.S.C. § 365(b)(1)(A)). However, in this case, section 365 appeared to conflict with section 1129(a)(9), which would have required the debtor to pay the priority claim in full on the effective date of the plan unless the creditor agreed otherwise. *Id.* Thus, the issue before the court was "whether the requirements of a prompt cure under [section] 365 serve to override the requirements of immediate payment under [section] 1129(a)(9)." *Id.* at 637–38.

The court noted that 11 U.S.C. § 1123(b)(2) governs the contents of a plan and "specifically states that if a debtor wishes to provide for the assumption or rejection of any executory contract or unexpired lease within the context of his plan, he must do so subject to [section] 365 of Title 11." *Id.* at 638. Therefore, the court concluded that 11 U.S.C. § 365 "is the exclusive remedy" for dealing with executory contracts in Chapter 11. *Id.* Since the contract at issue was an executory contract, the court found that 365 controlled. *Id.* Thus, the debtor was permitted to provide the creditor with adequate assurance of a prompt cure rather than required to make immediate payment under section 1129(a)(9). *Id.*

In *Chira*, the debtor had entered into a prepetition contract to sell a hotel in which he owned a fifty percent interest. *Chira v. Saal (In re Chira)*, 367 B.R. 888, 890 (S.D. Fla. 2007). Before the sale took place, the debtor was forced into involuntary bankruptcy. *Id.* at 889–90. The purchaser under the sales contract filed a motion in the bankruptcy court to compel the debtor's estate to either assume or reject the contract. *Id.* at 891. Thereafter, the purchaser and the bankruptcy trustee reached a settlement agreement concerning assumption of the contract. *Id.* at 891. The settlement agreement modified the original sales contract in that the trustee agreed to clear title to the hotel by eliminating a lease that burdened the property and the

purchaser agreed to pay additional sums to the estate in exchange for the elimination of the lease. *Id.* at 892.

The trustee then filed a motion to assume the contract and settle the dispute with the purchaser, which the bankruptcy court granted. *Id.* The other fifty percent owner of the property appealed, alleging that because the settlement agreement modified the original sales contract, the sales contract could no longer be assumed under section 365. *Id.* Rather, the other owner argued that section 363, which authorizes the trustee to "sell both the estate's interest . . . and the interest of any co-owner[,]" more properly applied. *Id.* at 896. The court rejected this argument, holding that modification of the original agreement did not preclude the trustee from assuming the agreement pursuant to section 365. *Id.* The court noted that, "[i]n the context of executory contracts, courts have recognized section 365 as the exclusive remedy available to parties wishing to sell property or other assets of the estate." *Id.* at 900.

The *Robinson* court's conclusion that section 365 "is the exclusive remedy" for dealing with executory contracts in Chapter 11 is equally applicable here. *In re Robinson Truck Line, Inc.*, 47 B.R. at 638. Furthermore, *Chira* is particularly instructive on two points. First, *Chira* makes clear that modification of the contract to be assumed is permissible. Here, the Litigation Trustee argues that the Novation Agreement is inconsistent with assumption and assignment because Mustang agreed to certain modifications to the Contract that are not required under section 365. Specifically, the Litigation Trustee points to the following circumstances: (1) the Novation Agreement provided that Mustang would release the Debtors from obligations to cure their defaults on the effective date of the Plan, rather than upon actual receipt of the payment as provided for under section 365; (2) Mustang agreed to waive past, present, and future claims against the Debtor, which section 365 does not require; and (3) Mustang agreed to allow the

purchaser (i.e., COSCO) to assign its rights under the Novation Agreement to its lenders, which is also not required by section 365.

These arguments overlook the fact that the Novation Agreement was a means of effectuating *consensual* assumption and assignment under section 365.   Contrary to the Litigation Trustee's assertion, the Novation Agreement did not "require" Mustang to do anything—rather, Mustang voluntarily agreed to such treatment.   The Court in *Chira*, citing the Fifth Circiut's holding in *Richmond Leasing*, emphasized that "the often-repeated statement that the debtor must accept the contract as a whole means only that debtor cannot choose to accept the benefits of the contract and reject its burdens to the detriment of the other party to the agreement."   *In re Chira*, 367 B.R. at 899 (quoting *Richmond Leasing v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985)).   Here, however, Mustang voluntarily agreed to make concessions which section 365 does not require.   This does not, in turn, mean that section 365 no longer applies.   This Court finds that there is nothing inconsistent about Mustang agreeing to these modifications and assumption under section 365.

Second, the Litigation Trustee makes the same argument here that the co-owner made in *Chira*—namely, that section 363 should apply instead of section 365.   Just as the court in *Chira* rejected this argument, so too does this Court.   Rather, this Court finds that "[i]n the context of executory contracts . . . section 365 [is] the exclusive remedy available to parties wishing to sell property or other assets of the estate."   *Id.* at 900; *see also In re Taylor*, 198 B.R. 142, 164–168 (Bankr. D. S.C. 1996) (rejecting debtor's request to sell a property interest pursuant to section 363(f) and noting that the debtor was required to follow section 365 before the court could authorize a transfer of the property); *In re Quintex Entm't, Inc.*, 950 F.2d 1492, 1495–96 (9th

Cir. 1991) (denying the sale of assets under section 363 because it involved executory contracts which the court determined had to be assumed or rejected as provided in section 365).

Further, the Litigation Trustee's attempt to distinguish an assumption from a novation is misguided. Regardless of whether a transaction is labeled a novation or an assumption and assignment, the end result is the same: the original party transfers its rights and obligations under an executory contract to a third party. If the transaction occurs when the original party is in bankruptcy, the original party cannot transfer the executory contract without first assuming it under section 365. *In re Mirant Corp.*, 440 F.3d 238, 253 (5th Cir. 2006) ("According to § 365(f)(2)(A), assumption must precede assignment."); *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 (3d Cir. 2001) ("Before an executory contract may be assigned, the trustee first must assume the contract . . . ."). Thus, in order for the Debtors to assign—or "novate"—the Contract to COSCO, they first had to assume the Contract. And, as the case law has made clear, assumption of an executory contract in bankruptcy can only be accomplished through section 365.

In conclusion, this Court rejects the Litigation Trustee's attempt to characterize the Novation Agreement as an alternate, non-section 365 means of dealing with the Contract. As the above-discussed cases have made clear, section 365 is the exclusive provision for dealing with executory contracts in bankruptcy. This conclusion does not change merely because Mustang agreed in the Novation Agreement to modifications which were not required by section 365. Importantly, Mustang voluntarily agreed to these modifications, none of which were detrimental to the Debtors.

    *c.  The Motion should be granted because the contract assumption defense bars the instant preference action*

Now that this Court has determined that the Contract was assumed and assigned pursuant to section 365 of the Code, it turns to the issue of whether the contract assumption defense bars the Litigation Trustee from pursuing the instant preference action. The contract assumption defense stems from *In re Superior Toy & Mfg. Co.*, a case decided by the Seventh Circuit Court of Appeals. *In re Superior Toy & Mfg. Co.*, 78 F.3d 1169. There, the court held that a trustee could not bring a preference suit to recover payments made pursuant to an executory contract that was assumed. *Id.* at 1176. The court reasoned that permitting a preference suit on an executory contract that had been assumed would undermine the purpose of section 365—namely, "to insure that a contracting party is made whole before a court can force the party to continue performing with a bankrupt debtor." *Id.* at 1174. The Fifth Circuit has not yet ruled on the viability of the contract assumption defense, although at least two courts within the Circuit have recognized and applied the defense.

In *Noble*, the debtor made prepetition payments to a creditor pursuant to a licensing agreement. *Noble v. ADP, Inc. (In re Jazzland, Inc.)*, Adv. No. 03-1202, 2004 WL 4945990, at *1 (Bankr. E.D. La. 2004). After the debtor filed a Chapter 11 petition, the bankruptcy court granted the debtor's motion to assume the licensing agreement. *Id.* Thereafter, the debtor's disbursing agent brought a preference suit to recover the payments made to the creditor. *Id.* Citing the contract assumption defense, the court held that the debtor's assumption of the licensing agreement precluded it from bringing a preference action against the creditor. *Id.* at *2. The court reasoned that, "[u]nder § 365, if assumption is approved, as it was in this case, the debtor must cure all prepetition defaults under the assumed contract. The estate cannot become bound to pay amounts due under an assumed contract and also recover for the estate payments made prepetition under the contract." *Id.*

26

Similarly, in *MMR Holding*, the debtor sought to recover prepetition payments made pursuant to a contract that was subsequently assumed and assigned to a third party. *MMR Holding Corp. v. C & C Consultants (In re MMR Holding Corp.)*, 203 B.R. 605, 606–07 (Bankr. M.D. La. 1996). The court denied the debtor's requested relief and held that prepetition payments—which might otherwise be recoverable as preferences—are not recoverable if the contract upon which the payments are based is assumed pursuant to section 365 of the Code.[16] *Id.* at 613. The court articulated its reasoning as follows: "the estate cannot simultaneously become administratively obligated for all amounts due under an assumed contract (both pre- and post-petition) and recover for the estate payments made pursuant to the contract." *Id.*

This Court finds the reasoning of the above-cited decisions persuasive. For these reasons, this Court holds that the contract assumption defense is applicable to the instant proceeding. Thus, if the Contract was assumed pursuant to section 365, then the contract assumption defense bars the Litigation Trustee from pursuing the instant preference action.

In sum, this Court concludes that the Novation Agreement was simply the mechanism through which assumption and assignment under section 365 of the Code was accomplished. It is no mere coincidence that multiple references are made to assumption and assignment and the payment of cure amounts throughout the Plan, Confirmation Order, Novation Agreement, and APA. For all of these reasons, the Court concludes that the Contract was assumed by the Debtors under section 365 of the Code. Therefore, under the contract assumption defense, the Litigation Trustee is barred as a matter of law from pursuing the instant preference action.

---

[16] *See also In re Brook Mays Music Co.*, 2007 Bankr. LEXIS 2902, at *5 (Bankr. N.D. Tex. 2007). There, pursuant to the court's instructions, the Chapter 7 trustee filed a report regarding his analysis of all potential preference actions. *Id.* at *2. After reviewing the report, the court ordered the trustee not to sue any party that received payments from the debtor pursuant to an executory contract that was ultimately assumed. *Id.* at *5–6.

2. Even if the Contract Assumption Defense is Inapplicable, this Court Lacks Subject Matter Jurisdiction Over the Instant Preference Action Because it was Settled and Released Pursuant to the Plan and Novation Agreement

Upon the filing of a bankruptcy petition, a bankruptcy estate is formed which comprises "all legal or equitable interests of the debtor in property as of the commencement of the case." *In re MPF Holdings US LLC*, 701 F.3d at 453 (citing *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 584 (5th Cir. 2008) (quoting 11 U.S.C. § 541(a)(1))). "'[R]ights of action such as claims based on state or federal law' are among the legal and equitable interests of the debtor that become part of the bankruptcy estate." *Id.* During a Chapter 11 case, the debtor in possession generally has the power to pursue claims belonging to the estate. *Id.* (citing 11 U.S.C. § 1107(a)). However, when a Chapter 11 plan is confirmed, the debtor loses debtor in possession status and with it, standing to pursue claims on behalf of the estate. *Id.*

Pursuant to 11 U.S.C. § 1123(b)(3), a debtor may retain causes of action "only if the plan of reorganization expressly provides for the claim's 'retention and enforcement by the debtor.'" *In re United Operating, LLC*, 540 F.3d 351, 355 (5th Cir. 2008) (quoting 11 U.S.C. § 1123(b)(3)(B)). To be effective, the plan's reservation of a claim must be "specific and unequivocal" in order to sufficiently inform creditors of any potential liability before they vote to approve the plan. *Id.* Here, the Fifth Circuit found that "the reservation language in the Plan was sufficiently specific and unequivocal under *United Operating*" to reserve all causes of action that were not released under the Plan. *In re MPF Holdings US LLC*, 701 F.3d at 457. Thus, the question on remand is whether the Litigation Trustee's claims *against Mustang* were released. If they were released, as Mustang argues, then the Litigation Trustee lacks standing to bring the instant suit, and this Court must dismiss for lack of subject matter jurisdiction.

a. *The Plan provides for a release of the preference claim against Mustang pursuant to the Novation Agreement*

Two sections of the Plan provide for a release of the Litigation Trustee's claims against Mustang.  First, section 4.03 of the Plan—"The Litigation Trust and Litigation Trustee"—preserves certain causes of action for the Litigation Trustee to pursue.  [Finding of Fact No. 8]. Importantly, section 4.03 excludes causes of action "released in connection with or under the Plan . . . ." *Id.*  Section 4.03 further provides that the Litigation Trustee has the right to prosecute any cause of action the Debtors' estate has against any person, "except to the extent waived, settled, or released under [the Plan] . . . ." *Id.*  Thus, to the extent the Litigation Trustee's claims against Mustang were waived, settled, or released, the Litigation Trustee is barred from bringing suit based upon those claims.

Second, Article XI of the Plan—"Compromises and Settlements"—provides that "each of the Novation Agreements effect a compromise or settlement among the parties thereto as particularly specified therein." *Id.*  In other words, the Plan gives effect to each individual Novation Agreement; any settlement contained in a Novation Agreement is recognized by the Plan.  Accordingly, the terms of the Novation Agreement determine whether the Litigation Trustee's claims against Mustang were released.

b. *Sections 3.4, 3.5, and 4.1 of the Novation Agreement release all parties from all claims under the Contract*

Section 4.1 of the Novation Agreement provides: "As full and final settlement of all past, present and future claims between the Parties, the New Buyer [i.e., COSCO] shall pay to the Vendor [i.e., Mustang] an amount equal to GBP 873,279.83, which amount shall be the 'Cure Amount' defined in Clause 1.3." [Finding of Fact No. 6].  Mustang alleges that this language

29

constitutes a final settlement and release of all claims between the parties, including the instant preference action. [Adv. Doc. No. 37, p. 11, ¶ 27].

The Litigation Trustee, however, alleges that the two sections preceding section 4.1 in the Novation Agreement—section 3.4 and 3.5—preclude a finding that Mustang's interpretation of section 4.1 is valid. [Adv. Doc. No. 32, p. 7]. In section 3.4, Mustang releases MPF from "any and all obligations and liabilities under the [] Contract" and simultaneously waives "any and all claims" or causes of action it may have, both now and in the future, against MPF "under or in connection with the [] Contract." [Finding of Fact No. 6]. Section 3.5 is an identical release provision wherein COSCO agrees to release Mustang. *Id.*

The Litigation Trustee argues that if section 4.1 operates as a full release for all parties, then sections 3.4 and 3.5 are meaningless. [Adv. Doc. No. 32, p. 7]. Since a contract must be interpreted to give effect to all of its provisions, the Litigation Trustee concludes that Mustang's interpretation of section 4.1 must fail. *Id.* The Court disagrees. Contrary to the Litigation Trustee's assertion, Mustang's reading of section 4.1 complements rather than conflicts with sections 3.4 and 3.5. While each of the latter provisions addresses releases between two parties only, section 4.1 encompasses all three parties by explicitly providing for a full and final settlement of all claims among the parties. The fact that section 4.1 is comprehensive and concerns all three parties does not render the three provisions inconsistent. If anything, section 4.1 clarifies the preceding sections by emphasizing that the Novation Agreement releases all parties from all claims related to the Contract upon payment of the Cure Amount.

In sum, sections 3.4, 3.5, and 4.1 of the Novation Agreement coexist and together release all parties (i.e., COSCO, MPF, and Mustang) from present and future liability for claims related to the Contract.

c.   *The Novation Agreement's broad release language is enforceable, and encompasses the instant preference action*

Further, the Litigation Trustee argues that even if sections 3.4, 3.5, and 4.1 of the Novation Agreement are consistent, they nonetheless do not release preference actions. [Adv. Doc. No. 32, p. 3]. The Litigation Trustee relies on *Victoria Bank*, which held that to effectively release a claim, the instrument must mention the claim to be released. *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991).[17]   Because the Novation Agreement does not specifically mention "preference actions," the Litigation Trustee concludes that his claim against Mustang was not released.

The Litigation Trustee's reliance on *Victoria Bank* is misplaced.   In that case, the borrower and its bank reached a settlement agreement releasing the parties from all claims

---

[17] There is no question that Texas law applies to the Plan. The Novation Agreement, however, purports to be governed by English law. [Main Case Doc. No. 392-25, p. 8]. In the Motion, Mustang relies on the plain language of the Novation Agreement and does not cite to English law. [Adv. Doc. No. 28, p. 9]. In his response, the Litigation Trustee argues that because Mustang failed to raise English law, this Court should presume that English law is the same as Texas law. *See* [Adv. Doc. No. 29, pp. 7–8]. In support of his position, the Litigation Trustee cites applicable case law stating that, in the absence of "proper invocation of foreign law by pleading and proof, Texas courts presume the foreign law to be the same as Texas law." *Smith v. Suarex (In re IFS Fin. Corp.)*, 417 B.R. 419, 434 n. 14 (Bankr. S.D. Tex. 2009); *In re Enron Corp.*, 2005 Bankr. LEXIS 6231, at n. 33 (Bankr. S.D. Tex. Dec. 9, 2005); *Excess Underwriters at Lloyd's v. Frank's Casing Crew & Rental Tools, Inc.*, 93 S.W.3d 178 (Tex. App. 2002). Further, the Litigation Trustee cites Texas Rule of Evidence 203, which provides that the party asserting the applicability of foreign law "shall give notice in the pleadings or other reasonable written notice, and at least 30 days prior to the date of trial such party shall furnish all parties copies of any written materials or sources that the party intends to use as proof of foreign law." [Adv. Doc. No. 29, pp. 7–8]. Finally, the Litigation Trustee reiterates that "this Court should decline to apply English law to any interpretation of the purported releases." [*Id.* at p. 8]. In its reply to the Litigation Trustee's response, Mustang does not dispute the Litigation Trustee's argument that Texas law applies. Mustang merely argues that the Litigation Trustee "misreads Texas law on the effectiveness of the release." [Adv. Doc. No. 37, p. 13].

Then, at the hearing on the Motion, Mr. Eisenberg, counsel for the Litigation Trustee, argued that "this Novation Agreement is governed by English law." [Tape Recording, 03/28/2013 Hearing at 10:54:52–10:54:59 a.m.]. This statement is clearly in direct conflict with the arguments that the Litigation Trustee made in his written response. Moreover, in attempting to invoke English law, the Litigation Trustee has not complied with the applicable rules which he himself brought to this Court's attention. He has not properly invoked English law by pleading; although the Litigation Trustee did cite English law in his response, he argued that it should only apply if this Court declined to apply Texas law to the Novation Agreement. [Adv. Doc. No. 29, p. 9]. Further, the Litigation Trustee did not provide Mustang with notice that he would assert the applicability of English law. To the contrary, the Litigation Trustee argued all along that English law should *not* apply. Because neither party properly invoked English law, this Court will apply Texas law to the issue of whether the instant preference action was released pursuant to the Plan and Novation Agreement.

arising out of a certain loan transaction. *Id.* at 934. The borrower subsequently brought suit against the bank based on a claim that arose out of a separate transaction. *Id.* at 934–35. The court held that the borrower was not barred from asserting its claim against the bank because the claim—which was completely unrelated to the loan transaction—was "not mentioned or clearly within the subject matter of the settlement agreement" and thus had not been released. *Id.* at 939.

In the dispute at bar, the more appropriate case to consider is *Keck v. Nat'l Union Fire Ins. Co.*, 20 S.W.2d 692 (Tex. 2000). There, the insured and its attorneys signed an agreement that released the parties from any claims "directly or indirectly attributable to the rendition of legal services by [the attorneys] to [the insured] . . . ." *Id.* at 696. At the time the parties entered into the agreement, the attorneys were defending the insured against a suit brought by one of the insured's vendors. The insured's excess insurance carrier subsequently brought an equitable subrogation claim against the attorneys for mishandling the case prosecuted by the vendor.[18] *Id.* at 695. Even though the settlement agreement did not specifically mention a possible equitable subrogation claim, the court held that the claim was "within the subject matter" of the agreement because it related to legal services rendered by the attorneys. The court concluded that the broad-form release language in the settlement agreement was enforceable and thus barred the excess insurance carrier's claim against the attorneys.[19]

The settlement agreement in *Keck* is analogous to the release provisions in the Novation Agreement. Like the settlement agreement, the Novation Agreement released the parties from

---

[18] Although the excess insurance carrier was not a party to the settlement agreement, the court held that it was proper for the excess insurance carrier to "stand in the shoes of its insured and assert the insured's claims" against the attorneys. *Keck*, 20 S.W.2d at 700 (citing *Am. Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 484 (Tex. 1992)).

[19] The settlement agreement in *Keck* only covered the attorneys' legal services "between June 1, 1988 and April 1, 1992." *Keck*, 20 S.W.2d at 696. While the settlement agreement barred claims based on the rendition of legal services during that time period, the court held that the agreement did not foreclose claims arising from the attorneys' legal services after April 1, 1992. *Id.* at 703.

any and all claims arising out of a particular transaction—in this case, the Contract. Therefore, since the instant preference action is based upon payments made pursuant to the Contract, the claim is "within the subject matter" of the Novation Agreement even though it was not specifically mentioned. Accordingly, the Litigation Trustee's preference action was released pursuant to the broad-form release language in the Novation Agreement.

  d. *It is of no import that the Novation Agreement uses the term "settlement" and not "release"*

As a last resort, the Litigation Trustee argues that section 4.1 of the Novation Agreement does not release the parties because it contains the word "settlement" rather than "release." [Adv. Doc. No. 32, p. 7]. To support his position, the Litigation Trustee cites *Ayers*, which held that a document entitled "settlement" is not controlling as to whether the document is a release. *Id.* (citing *Ayers v. Pastime Amusement Co.*, 240 F. Supp. 811, 812 (E.D.S.C. 1965). Additionally, the Litigation Trustee notes that the word "release" was used in sections 3.4 and 3.5, but not in section 4.1. [Adv. Doc. No. 32, p. 7]. Thus, the Litigation Trustee concludes that the parties did not intend for section 4.1 to operate as a release.

The Litigation Trustee's arguments are unpersuasive. First, *Ayers* merely stands for the proposition that a document's effect cannot be ascertained simply by looking at the document's title; rather, one must look to the contents of the document itself. *Ayers*, 240 F. Supp. at 812. The court explained that "the agreement of the parties" determines a document's effect, and that the parties' agreement should be gleaned from the document itself—in other words, the intent of the parties is more important than the terminology used in the document. *Id.* Thus, *Ayers* actually undercuts the Litigation Trustee's argument. Second, the fact that the word "release" is used in sections 3.4 and 3.5 has no bearing on the effect of section 4.1. As discussed above, section 4.1 is more comprehensive than sections 3.4 and 3.5. The drafters of the Novation

Agreement had discretion to use or omit certain words within each section in order to convey the parties' intent.  When the three sections are read as a whole, the parties' intent is evident: upon payment of the Cure Amount, all parties are released from all claims relating to the Contract.

As an additional point, section 4.03 of the Plan explicitly prohibits the Litigation Trustee from pursuing a claim that has been "waived, *settled*, or released under this Plan . . . ." (emphasis added).  [Finding of Fact No. 8].  Even if section 4.1 is construed so that it does not *release* claims under the Contract, there is no doubt that the parties agreed to *settle* all potential claims—both now and in the future—related to the Contract.[20]  Thus, the Plan bars the Litigation Trustee's preference claim, regardless of whether the claim has been settled or released.  In fact, the use of the term "settlement" in section 4.1 of the Novation Agreement mirrors the language in section 1123(b)(3) of the Code, which provides that a plan of reorganization may provide for "the *settlement* or adjustment of any claim or interest belonging to the debtor or to the estate[,]" or "provide for . . . the retention and enforcement . . . of any such claim or interest."  11 U.S.C. § 1123(b)(3) (emphasis added).  In sum, the Litigation Trustee's attempt to distinguish settlement from release is off the mark.

Thus, this Court also lacks subject matter jurisdiction over the instant adversary proceeding because the preference action was settled and released pursuant to the Plan and Novation Agreement.  The Plan reserved to the Litigation Trustee the right to pursue causes of action "except to the extent waived, settled, or released," and provided that the novation

---

[20] The Litigation Trustee argues that sections 3.4 and 3.5 of the Novation Agreement are limited in scope because they only apply to claims "under or in connection with [the Contract]."  [Adv. Doc. No. 32, p. 8].  By contrast, the Litigation Trustee interprets section 4.1's broad-form release language to forever bar all claims among the parties, regardless of whether they are related to the Contract.  *Id.*  The Litigation Trustee thus concludes that the three provisions are inconsistent.  *Id.*  The Court rejects this argument.  Section 4.1 explicitly provides that the purpose of the Cure Amount—which triggers all of the releases under the Novation Agreement—is to settle all claims "under *[the Contract]*." (emphasis added).  [Finding of Fact No. 6].  The Litigation Trustee has offered no evidence showing that the parties intended section 4.1 to cover anything other than the Contract.  Therefore, the Litigation Trustee's argument is unpersuasive.

34

agreements effectuate settlements as specified therein.  [Finding of Fact No. 8].  Here, the Novation Agreement settled "all past, present and future claims between the Parties" related to the Contract.  [Finding of Fact No. 6].  Since the preference action was settled, the Trustee lacks standing to pursue the instant cause of action.  For this separate and independent reason, dismissal under Federal Rule of Civil Procedure 12(b)(1) is warranted.

**D.  This Court will not Reach the Issue of Whether Dismissal is Warranted Under Federal Rule of Civil Procedure 12(b)(6)**

Mustang has also asserted that Federal Rule of Civil Procedure 12(b)(6), which provides for dismissal for "failure to state a claim upon which relief can be granted," is a separate and independent basis for dismissal.  In light of this Court's finding that it lacks subject matter jurisdiction over the dispute at bar, this Court will not address the issue of whether dismissal is also warranted under Federal Rule of Civil Procedure 12(b)(6).  *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 512 (5th Cir. 1980) ("If the allegations do not survive the jurisdictional attack, then there is no jurisdiction even to consider the other claims, much less to entertain a Rule 12(b)(6) motion to dismiss those claims.").

## IV.   CONCLUSION

In conclusion, the Court finds that the Contract was assumed pursuant to section 365 and assigned to COSCO by virtue of the Novation Agreement.  Since the Contract was assumed under section 365, the contract assumption defense bars the Litigation Trustee as a matter of law from pursuing the instant preference action against Mustang to recover payments made pursuant to the Contract.  For this reason, dismissal under Federal Rule of Civil Procedure 12(b)(1) is warranted.

Alternatively, even if the contract assumption defense is inapplicable, this adversary proceeding should be dismissed because the preference action was settled and released in

connection with the Plan and Novation Agreement.   The Plan specifically carved out "waived, settled, or released" claims, and referred to the relevant novation agreements as effectuating settlements as specified therein.   [Finding of Fact No. 8].   The Novation Agreement, in turn, settled "all past, present and future claims between the Parties" related to the Contract.   [Finding of Fact No. 6].   Therefore, dismissal under Federal Rule of Civil Procedure 12(b)(1) is warranted for this separate and independent reason.

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

Signed this 18th day of June, 2013.

Jeff Bohm
Chief United States Bankruptcy Judge